| | | |
|---|---|---|
| STATE OF OHIO<br><br><br><br>DEPARTMENT OF REHABILITATION AND CORRECTION | **SUBJECT:**<br>**Execution** | PAGE __1__ OF __9__ |
| | | NUMBER: 01-COM-11 |
| | RULE/CODE REFERENCE:<br>ORC 2949.22 | SUPERCEDES:<br>01-COM-11 dated 01/08/2004 |
| | RELATED ACA STANDARDS: | EFFECTIVE DATE:<br>July 10, 2006 |
| | RELATED AUDIT STANDARDS: | APPROVED:<br>*Terry J. Collins* |

## I.  AUTHORITY

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Ohio Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

## II.  PURPOSE

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

## III.  APPLICABILITY

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

## IV.  DEFINITIONS

As used in this policy, the following will apply:

Execution Team:  A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF). Their duties also include preparation and testing of equipment and carrying out pre- and post-execution activities.

Critical Incident Debriefing Team:  A group selected by the SOCF Warden available to assist any persons involved in the execution process. A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

- Worker's own experiences of the execution including reactions and perceptions.
- Review any negative aspects and feelings.

DRC 1361



| SUBJECT: **Execution** | PAGE __2__ OF __9__ |
|---|---|

- Review any positive aspects and feelings.
- Relationships with workers and/or family.
- Empathy (sharing) with others.
- Disengagement from execution experience.
- Integration of this experience into the professional work role for a positive future contribution to the overall team effort.

Stay: A court-ordered suspension or postponement of a legal execution.

Lethal Injection: The form of execution whereby a continuous intravenous injection of a series of drugs in sufficient dosages is administered to cause death.

Reprieve: The postponement of an execution.

V. **POLICY**

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by Ohio Courts of Law. All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

It is the responsibility of the Director to designate a penal institution where death sentences shall be executed. The Warden of that facility, or Deputy Warden in the absence of the Warden, is responsible for carrying out the death sentence on the date established by the Ohio Supreme Court.

VI. **PROCEDURES**

A. General Guidelines

1. All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution: Mansfield Correctional Institution (MANCI) or Ohio State Penitentiary (OSP) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2. All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3. Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

4. The Ohio Supreme Court shall designate the date of execution. Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director and the SOCF Warden.

DRC 1362

| SUBJECT: **Execution** | PAGE___3___ OF _9_ |
|---|---|

5. Attendance at the execution is governed by the Ohio Revised Code, section 2949.25 and includes:

- The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
- The Sheriff of the county in which the prisoner was tried and convicted.
- The Director of the Department of Rehabilitation and Correction, or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
- Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
- The prisoner may select one of the following persons: a DRC chaplain, minister-of-record, clergy, rabbi, priest, imam, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect, subject to the approval of the Warden.
- Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
- Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations, as detailed in Department Policy 03-OVS-06, Victim Involvement in the Execution Process.
- Representatives of the news media as the Director or his designee authorizes which shall include at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

   a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

   b. Secondary communications will be via cellular telephone.

   c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

DRC 1362

| SUBJECT: **Execution** | PAGE___4___ OF _9_ |

B. Execution Procedures

1. Approximately thirty (30) days prior to the scheduled execution date:

   a. The MANCI, OSP or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA, Ohio State Highway Patrol (Portsmouth and Jackson), and the Office of Victim Services.

   b. The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

2. Approximately seven (7) days prior to the execution:

   a. The MANCI, OSP or ORW Warden will have the Execution Information Release (DRC 1808) completed by the condemned prisoner. This information will verify information on the condemned prisoner, visitors, witnesses, spiritual advisor, attorney, requested witness, property, and funeral arrangements.

   b. The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in this Policy.

   c. The names and relationships of the victim's witnesses will be supplied to the SOCF Warden.

3. Approximately twenty-four (24) hours prior to the scheduled execution:

   a. The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF. The condemned inmate will be constantly monitored by at least three (3) members of the execution team. A log will be maintained including, but not limited to, visitors, movement, mood changes, meals served, showers, telephone calls, etc.

   b. The SOCF staff psychologist will interview the prisoner periodically and submit progress reports to the Warden. All inmate files shall be maintained in the Warden's office at SOCF.

   c. The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

4. The following events will take place upon arrival at the Death House:

   a. Once the condemned inmate is at SOCF, the Death House will be restricted to the following:

DRC 1362

| SUBJECT: **Execution** | PAGE  5  OF  9 |

Director and/or designee(s)
Warden
Chief Public Information Officer(s)
Institution Deputy Warden
Administrative Assistant to the Warden
Chaplain
Physician
Chief of Security
Maintenance Superintendent
Any other person as deemed necessary by the Warden.

b. Every possible effort shall be made to anticipate and plan for foreseeable difficulties in establishing and maintaining the intravenous (IV) lines. The condemned prisoner shall be evaluated by appropriately trained staff on the day of arrival at the institution, to evaluate the prisoner's veins and plan for the insertion of the IV lines. This evaluation shall include a "hands-on" examination as well as a review of the medical chart. At a minimum, the inmate shall be evaluated upon arrival, later that evening at a time to be determined by the warden, and on the following morning prior to nine a.m. Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

c. SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

d. The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

e. The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will have previously, per paragraph 2, specified who is to receive his or her personal effects.

f. The condemned prisoner will, per paragraph 2, specify in writing his/her request for funeral arrangements.

g. The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

h. The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m.

DRC 1362

| SUBJECT: **Execution** | PAGE   6   OF  9  |
|---|---|

   i.  All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

   j.  Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

   k.  The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

   l.  The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

   m.  The Warden will relay any out of the ordinary activity to the South Regional Director.

   n.  The Execution Team will continue to drill/rehearse.

5. These procedures shall be followed concerning the medications used in the execution.

   a.  Upon notification to the Warden of a firm execution date, a person qualified under Ohio law to administer medications shall order a quantity of the following drugs in a timely manner from the institution's licensed pharmacist: thiopental sodium, pancuronium bromide and potassium chloride. A sufficient quantity shall be ordered as a contingency against the contamination or other inadvertent loss of any of the drugs.

Prior to the execution and upon arrival of the inmate at the institution, a medical review of the inmate shall be conducted to establish any unique factors which may impact the manner in which the execution team carries out the execution. This evaluation shall include a "hands-on" examination as well as a review of the medical chart. Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

   b.  On the day of the execution, the person qualified under Ohio law to administer medications shall take possession of the drugs thiopental sodium, pancuronium bromide and potassium chloride from the institution pharmacy, and shall document possession of the drugs by signing a receipt or log. The person qualified under Ohio law to administer medications shall deliver the drugs to the death house.

The person qualified under Ohio law to administer medications shall, in the presence of a witness, give possession of the drugs to a person qualified to prepare intravenous injections. This transfer shall be documented by a receipt signed by these three parties. The person qualified under Ohio law to administer medications shall notify the command center upon the delivery of drugs and the command center shall log the time of delivery, the quantity, name and type of drugs delivered.

   c.  The drugs shall be prepared for injection by a person qualified under Ohio law to administer and prepare drugs for intravenous injections. The preparation of the drugs

DRC 1362

| SUBJECT: **Execution** | PAGE__7__ OF _9_ |
|---|---|

shall be monitored by a similarly qualified witness who shall independently verify the preparation and dosage of the drugs. When the drugs are prepared, the command center shall be notified and the time of the preparation recorded. The command center shall also record what drugs were prepared, the quantity, name and dosage of the prepared drugs.

d. The execution team shall make every effort to establish IV sites in two locations, and they shall take the amount of time necessary when pursuing this objective. This step shall be accomplished in the holding cell, and the staff shall utilize heparin locks to create the sites and keep them open. The team shall test the viability of the IV site with a small amount of saline, to be flushed through the heparin lock.

e. Once the inmate has been escorted to the chamber, a low-pressure saline drip shall be connected to the IV sites.

f. The drugs shall be prepared as follows:[1]

    i. Two grams of Thiopental Sodium prepared with 25 mg/cc concentration for a total of 80cc which are placed in two syringes labeled "one" and "two."

    ii. 100 mg of Pancuronium Bromide is prepared with 2mg/ml concentration for a total of 50cc which is placed into two 25cc syringes labeled "three" and "four."

    iii. 100 milliequivalents of Potassium Chloride are prepared with 2 meq/cc concentration for a total of 50cc. The preparation is placed in a syringe labeled "five."

g. The arm veins near the joint between the upper and lower arm will be utilized as the preferred site for the injection. In the event that the execution team is unable to prepare the inmate's veins at the preferred site to receive the intravenous dose of drugs, a qualified medical person authorized to administer intravenous drugs shall use an alternative site to deliver the drugs as they may be authorized by law.

6. Approximately one (1) hour prior to the scheduled execution:

a. The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

b. Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

---

[1] Depending upon the form and concentration of drugs delivered, it may be necessary to modify the preparation of syringes. In the event of any modification for any reason, a qualified witness shall review any modifications and the command center shall be notified and any changes recorded.
DRC 1362

| SUBJECT: **Execution** | PAGE__8__ OF _9_ |
|---|---|

7. Approximately fifteen (15) minutes prior to the scheduled execution:

   a. The warden shall read the death warrant to the condemned prisoner.

   b. All authorized witness groups will be escorted to the death house separately by designated staff.

8. Execution:

   a. The Warden and Execution Team will escort the condemned prisoner to the execution chamber, place the condemned prisoner on the lethal injection bed, secure the straps and insert the intravenous injection tubes.

   b. The Warden will ask the condemned prisoner if he has any last words. If the prisoner has a last statement, he will be allowed to make it while the witnesses are present in the adjacent viewing chambers, and are able to see him and hear him via microphone. There will be no restriction on the content of the condemned prisoner's statement and no unreasonable restriction on the duration of the prisoner's last statement.

   c. Upon the Warden's signal, the injections shall be administered in the order described above by a person qualified under Ohio law to administer intravenous injections. The start and finish time of each syringe shall be reported to the command center and recorded in a log. The low-pressure saline drip shall be allowed to flush saline through the lines for at least sixty seconds between syringes two and three, between syringes four and five, and again after syringe five.

   d. The execution team leader and the warden shall observe the inmate's IV sites for signs of infiltration throughout the time that the drugs are being administered to the inmate. In the event that both IV sites become compromised, the team shall take such time as may be necessary to establish a viable IV site.

   e. Once the execution cycle is completed, the curtains will be drawn and the designated personnel will examine the body and pronounce the prisoner dead.

   f. The curtains will be opened for the Warden to pronounce the time of death. Witnesses will be escorted from the Death House.

9. Post-Execution:

   a. The Warden, or his designee, will notify the Director that the execution has been carried out.

   b. The Execution Team will remove the deceased from the execution bed, and place him or her on a gurney.

DRC 1362

| SUBJECT: **Execution** | PAGE ___9___ OF __9__ |
|---|---|

    c. Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request

    d. The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

10. Debriefing:

    a. The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

    b. The critical incident debriefing team will conduct interview in accordance with CIM guidelines.

ATTACHMENTS:

DRC 1808 Execution Information Release

DRC 1362

STATE OF OHIO



DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT:<br>**Execution** | PAGE __1__ OF __9__ |
|---|---|
| | NUMBER: 01-COM-11 |
| RULE/CODE REFERENCE:<br>ORC 2949.22 | SUPERCEDES:<br>01-COM-11 dated 07/10/06 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br>October 11, 2006 |
| RELATED AUDIT STANDARDS: | APPROVED:<br>*Terry J. Collins* |

## I.     AUTHORITY

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Ohio Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

## II.     PURPOSE

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

## III.     APPLICABILITY

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

## IV.     DEFINITIONS

As used in this policy, the following will apply:

Execution Team:  A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF) and the Religious Services Administrator.  Their duties also include preparation and testing of equipment carrying out pre- and post-execution activities; and counseling with the inmate.

Critical Incident Debriefing Team:  A group selected by the SOCF Warden, and including the Religious Services Administrator available to assist any persons involved in the execution process.  A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

DRC 1361



**EXHIBIT**

B

| SUBJECT: **Execution** | PAGE __2__ OF __9__ |
|---|---|

- Worker's own experiences of the execution including reactions and perceptions.
- Review any negative aspects and feelings.
- Review any positive aspects and feelings.
- Relationships with workers and/or family.
- Empathy (sharing) with others.
- Disengagement from execution experience.
- Integration of this experience into the professional work role for a positive future contribution to the overall team effort.
- Exploring Religious Convictions and feelings.

Stay:  A court-ordered suspension or postponement of a legal execution.

Lethal Injection:  The form of execution whereby a continuous intravenous injection of a series of drugs in sufficient dosages is administered to cause death.

Reprieve:  The postponement of an execution.

**V.    POLICY**

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by Ohio Courts of Law. All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

It is the responsibility of the Director to designate a penal institution where death sentences shall be executed. The Warden of that facility, or Deputy Warden in the absence of the Warden, is responsible for carrying out the death sentence on the date established by the Ohio Supreme Court.

**VI.    PROCEDURES**

A.  General Guidelines

1.  All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution: Mansfield Correctional Institution (MANCI) or Ohio State Penitentiary (OSP) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2.  All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3.  Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

| SUBJECT: **Execution** | PAGE 3 OF 9 |
|---|---|

4. The Ohio Supreme Court shall designate the date of execution. Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director, the Religious Services Administrator and the SOCF Warden.

5. Attendance at the execution is governed by the Ohio Revised Code, section 2949.25 and includes:

   - The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
   - The Sheriff of the county in which the prisoner was tried and convicted.
   - The Director of the Department of Rehabilitation and Correction, or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
   - Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
   - The prisoner may select one of the following persons: the Religious Services Administrator, minister-of-record, clergy, rabbi, priest, imam, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect, subject to the approval of the Warden.
   - Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
   - Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations, as detailed in Department Policy 03-OVS-06, Victim Involvement in the Execution Process.
   - Representatives of the news media as the Director or his designee authorizes which shall include at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

   a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

   b. Secondary communications will be via cellular telephone.

   c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

DRC 1362

| SUBJECT: **Execution** | PAGE  4  OF  9 |
| --- | --- |

B. Execution Procedures

1. Approximately thirty (30) days prior to the scheduled execution date:

    a. The MANCI, OSP or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA, Ohio State Highway Patrol (Portsmouth and Jackson), and the Office of Victim Services.

    b. The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

    c. The Religious Service s Administrator (RSA) shall make contact with the inmate to establish counseling and family contact information

2. Approximately seven (7) days prior to the execution:

    a. The MANCI, OSP or ORW Warden will have the Execution Information Release (DRC 1808) completed by the condemned prisoner. This information will verify information on the condemned prisoner, visitors, witnesses, spiritual advisor, attorney, requested witness, property, and funeral arrangements.

    b. The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in this Policy.

    c. The names and relationships of the victim's witnesses will be supplied to the SOCF Warden.

    d. The RSA will provide family information from inmate to warden at SOCF

3. Approximately twenty-four (24) hours prior to the scheduled execution:

    a. The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF. The condemned inmate will be constantly monitored by at least three (3) members of the execution team. A log will be maintained including, but not limited to, visitors, movement, mood changes, meals served, showers, telephone calls, etc.

    b. The SOCF staff psychologist will interview the prisoner periodically and submit progress reports to the Warden. All inmate files shall be maintained in the Warden's office at SOCF.

    c. The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

DRC 1362

| SUBJECT: **Execution** | PAGE ___5___ OF _9_ |
|---|---|

    d. The RSA will provide counseling and spiritual support unless the inmate requests not to have contact.

    e. Beginning with his arrival at SOCF, the inmate will not be forced to meet with non-staff visitors that he does not wish to see.

4. The following events will take place upon arrival at the Death House:

    a. Once the condemned inmate is at SOCF, the Death House will be restricted to the following:

        Director and/or designee(s)
        Warden
        Chief Public Information Officer(s)
        Institution Deputy Warden
        Administrative Assistant to the Warden
        Chaplain
        Physician
        Chief of Security
        Maintenance Superintendent
        Any other person as deemed necessary by the Warden.

    b. Every possible effort shall be made to anticipate and plan for foreseeable difficulties in establishing and maintaining the intravenous (IV) lines. The condemned prisoner shall be evaluated by appropriately trained staff on the day of arrival at the institution, to evaluate the prisoner's veins and plan for the insertion of the IV lines. This evaluation shall include a "hands-on" examination as well as a review of the medical chart. At a minimum, the inmate shall be evaluated upon arrival, later that evening at a time to be determined by the warden, and on the following morning prior to nine a.m. Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

    c. SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

    d. The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

    e. The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will have previously, per paragraph 2, specified who is to receive his or her personal effects.

    f. The condemned prisoner will, per paragraph 2, specify in writing his/her request for funeral arrangements.

| SUBJECT: **Execution** | PAGE____6____ OF __9__ |
|---|---|

    g.  The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

    h.  The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m.

    i.  All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

    j.  Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

    k.  The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

    l.  The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

    m.  The Warden will relay any out of the ordinary activity to the South Regional Director.

    n.  The Execution Team will continue to drill/rehearse.

5.  These procedures shall be followed concerning the medications used in the execution.

    a.  Upon notification to the Warden of a firm execution date, a person qualified under Ohio law to administer medications shall order a quantity of the following drugs in a timely manner from the institution's licensed pharmacist: thiopental sodium, pancuronium bromide and potassium chloride. A sufficient quantity shall be ordered as a contingency against the contamination or other inadvertent loss of any of the drugs.

    Prior to the execution and upon arrival of the inmate at the institution, a medical review of the inmate shall be conducted to establish any unique factors which may impact the manner in which the execution team carries out the execution. This evaluation shall include a "hands-on" examination as well as a review of the medical chart. Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

    b.  On the day of the execution, the person qualified under Ohio law to administer medications shall take possession of the drugs thiopental sodium, pancuronium bromide and potassium chloride from the institution pharmacy, and shall document possession of the drugs by signing a receipt or log. The

| SUBJECT: **Execution** | PAGE 7 OF 9 |
|---|---|

person qualified under Ohio law to administer medications shall deliver the drugs to the death house.

The person qualified under Ohio law to administer medications shall, in the presence of a witness, give possession of the drugs to a person qualified to prepare intravenous injections. This transfer shall be documented by a receipt signed by these three parties. The person qualified under Ohio law to administer medications shall notify the command center upon the delivery of drugs and the command center shall log the time of delivery, the quantity, name and type of drugs delivered.

c. The drugs shall be prepared for injection by a person qualified under Ohio law to administer and prepare drugs for intravenous injections. The preparation of the drugs shall be monitored by a similarly qualified witness who shall independently verify the preparation and dosage of the drugs. When the drugs are prepared, the command center shall be notified and the time of the preparation recorded. The command center shall also record what drugs were prepared, the quantity, name and dosage of the prepared drugs.

d. The execution team shall make every effort to establish IV sites in two locations, and they shall take the amount of time necessary when pursuing this objective. This step shall be accomplished in the holding cell, and the staff shall utilize heparin locks to create the sites and keep them open. The team shall test the viability of the IV site with a small amount of saline, to be flushed through the heparin lock.

e. Once the inmate has been escorted to the chamber, a low-pressure saline drip shall be connected to the IV sites.

f. The drugs shall be prepared as follows:[1]

  i. Two grams of Thiopental Sodium prepared with 25 mg/cc concentration for a total of 80cc which are placed in two syringes labeled "one" and "two."

  ii. 100 mg of Pancuronium Bromide is prepared with 2mg/ml concentration for a total of 50cc which is placed into two 25cc syringes labeled "three" and "four."

  iii. 100 milliequivalents of Potassium Chloride are prepared with 2 meq/cc concentration for a total of 50cc. The preparation is placed in a syringe labeled "five."

g. The arm veins near the joint between the upper and lower arm will be utilized as the preferred site for the injection. In the event that the execution team is unable to prepare the inmate's veins at the preferred site to receive the

---

[1] Depending upon the form and concentration of drugs delivered, it may be necessary to modify the preparation of syringes. In the event of any modification for any reason, a qualified witness shall review any modifications and the command center shall be notified and any changes recorded.
DRC 1362

| SUBJECT: Execution | PAGE 8 OF 9 |
|---|---|

intravenous dose of drugs, a qualified medical person authorized to administer intravenous drugs shall use an alternative site to deliver the drugs as they may be authorized by law.

6. Approximately one (1) hour prior to the scheduled execution:

a. The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

b. Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

c. The RSA will be present to counsel and provide spiritual support to the inmate and staff.

7. Approximately fifteen (15) minutes prior to the scheduled execution:

a. The warden shall read the death warrant to the condemned prisoner

b. All authorized witness groups will be escorted to the death house separately by designated staff.

8. Execution:

a. The Warden and Execution Team will escort the condemned prisoner to the execution chamber, place the condemned prisoner on the lethal injection bed, secure the straps and insert the intravenous injection tubes.

b. The Warden will ask the condemned prisoner if he has any last words. If the prisoner has a last statement, he will be allowed to make it while the witnesses are present in the adjacent viewing chambers, and are able to see him and hear him via microphone. There will be no restriction on the content of the condemned prisoner's statement and no unreasonable restriction on the duration of the prisoner's last statement.

c. Upon the Warden's signal, the injections shall be administered in the order described above by a person qualified under Ohio law to administer intravenous injections. The start and finish time of each syringe shall be reported to the command center and recorded in a log. The low-pressure saline drip shall be allowed to flush saline through the lines for at least sixty seconds between syringes two and three, between syringes four and five, and again after syringe five.

d. The execution team leader and the warden shall observe the inmate's IV sites for signs of infiltration throughout the time that the drugs are being administered to the inmate. In the event that both IV sites become

| SUBJECT: **Execution** | PAGE  9  OF  9 |
| --- | --- |

compromised, the team shall take such time as may be necessary to establish a viable IV site.

   e. The RSA or the inmate's Spiritual Advisor will anoint the body of the inmate if requested by the inmate.

   f. The RSA will coordinate the burial of the inmate's body with local chaplains if the inmate's family does not want the body.

9. Post-Execution:

   a. The Warden, or his designee, will notify the Director that the execution has been carried out.

   b. The Execution Team will remove the deceased from the execution bed, and place him or her on a gurney.

   c. Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

   d. The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

10. Debriefing:

   a. The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

   b. The critical incident debriefing team will conduct interview in accordance with CIM guidelines.

   c. The RSA will be available for debriefing for the staff and the family of the inmate

ATTACHMENTS:

DRC 1808 Execution Information Release

EXHIBIT
C

## INTERDISCIPLINARY PROGRESS NOTES

| Date & Time | Document significant events during clients course of treatment; implementation of treatment plan and response to treatment. Sign and title all notes. | Dept. or Discipline |
|---|---|---|
| 1/22/02 9AM DR1 | Pt says his stomach is acking up again he had H Pylore treatment 8 months ago which helped for last 6 months will repeat this course of treatment | |
| 1/26/02 | Sgt. Werner called med record @ 1085 AM to see if Cooley 194-016 could be maced. (No record of asthma or upper res.) so could be OC on him. M Honaker Clerk 3 | |
| 7-18-03 | medical / dental to Record Dept for transport to SOCF., M Honaker Clerk 3 — 800 am | |
| 1/8/03 – 12⁵³ pm | Intake exam completed, BP 154/110, P88 R14 – Joking - nervous laughter. States "when you start the IV's come 15 min early, I don't have any veins." I advised team members would be doing IV's – Veins are sparce - has good vein to right hand – Smaller to on left — I discussed with him any need for something for his nerves. He refuses intervention @ this time. Chart to physician – NC Parker | |
| 1/4/03 8⁴⁵ am | MER completed for evaluation of inmate's right hand after he hit the wall in his cell — see MER for details | Nora Parker |
| 1/3-03 8⁰⁰ am | Received / reviewed chart - No pending c/o No Rx. NSC PRN | SV |

DMH-MedR-1007



**Office of the Ohio Public Defender**
8 East Long Street
Columbus, Ohio 43215-2998

www.opd.ohio.gov

(614) 466-5394
Fax (614) 644-0708

TIMOTHY YOUNG
State Public Defender

May 22, 2008

Matthew A Kenai
Assistant Ohio Attorney General
Capital Crimes Unit
Office of the Attorney General
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215

Re:   **Medical Records Request for Richard W. Cooey, #194-016**
      **Please expedite this request.**

Dear Mr. Kanai:

Under the Memorandum of Understanding between the Ohio Attorney General, the Ohio Public Defender, and the Ohio Department of Rehabilitation and Correction, I request the release of medical records for our capital client Richard W Cooey, Inmate Number 194-016. Mr Cooey is currently incarcerated at the Ohio State Penitentiary, starting around October of 2005  Prior to that, he was incarcerated in the Mansfield Correctional Institution, starting around February of 1995, and prior to that he was incarcerated at the Southern Ohio Correctional Facility starting around December of 1986

We request all of Mr Cooey's medical records from these institutions.

Enclosed please find three copies of our standard agreement signed by Mr Cooey and his counsel of record with this Office, Kelly L Culshaw  Please sign each document and return two copies to me so we have one for our files and one for Mr Cooey  The remaining copy is for your file.

Thank you in advance for your assistance with this request  Please contact me if you have any questions about this request (my direct phone line is 644-1630)

Sincerely,

Joseph E Wilhelm
Chief Counsel
Death Penalty Division

JEW/bj
Enclosures

**EXHIBIT**

D

## DECLARATION OF MARK J.S. HEATH, M.D.

The undersigned, Mark, J S Heath, M D, being of lawful age, states the following:

I have served, and am serving, as an expert witness regarding the practice of lethal injection as a method of execution by Ohio, in numerous other states, and by the U S Federal Government

I am currently serving as an expert witness in the litigation surrounding lethal injection in the case of *State v. Rivera*, Case nos 04CR065940, 05CR068067 Lorain Co , Ohio

### I - Introduction

I have reviewed the case of Mr Richard Cooey and several years ago submitted an affidavit regarding the procedures used by the Ohio Department of Rehabilitation and Correction (ODRC) and the Southern Ohio Correctional Facility (SOCF) to carry out executions by lethal injection

I have been asked by Kim Rigby, counsel for Mr Richard Cooey, to review documents and information specific to Mr Cooey, and to comment on whether there are any features or circumstances of his case that warrant modification of any opinions I have provided to courts in the past

In February 2008 I submitted a detailed affidavit regarding ODRC's lethal injection procedures for the case of *State v Rivera* In the present document I rely upon the same information that I relied upon for that affidavit Additionally, I rely upon documentation and information provided to me by Mr Cooey's attorney, Kim Rigby, from the Office of the Ohio Public Defender This documentation includes an incomplete medical record, which I have been authorized to review and discuss in this affidavit The documentation also includes comments by personnel regarding the attributes of Mr Cooey's veins

The additional information that has been provided to me raises two additional areas of concern that are particular to the case of Mr Cooey

### II - Mr. Cooey is being treated with Topamax, an anticonvulsant medication that may lower the safety margin of the already relatively low dose of thiopental being used by the ODRC.

The first concern that is particular to Mr Cooey is that he is taking the anticonvulsant medication Topamax (topiramate) Like many drugs that are used to treat seizures Topamax interacts with the GABA neurotransmitter system in the brain The GABA neurotransmitter is also involved in the actions of many other depressant/sedative/anesthetic drugs, such as ethanol (alcohol) and barbiturates A person who has been taking any of the substances over time is likely to devel...

EXHIBIT

E

resistance to the effects of other substances that interact with the GABA neurotransmitter system. For example, a person who has been consuming ethanol on a daily basis for many months would likely be resistant to the effects of a barbiturate, and vice versa. Mr. Cooey's ongoing exposure to Topamax may decrease his sensitivity to barbiturates including thiopental. Topamax also has analgesic (pain reducing) properties, and thus may place Mr. Cooey at increased risk for awareness during the attempted anesthetic component of the lethal injection procedure. As explained above, if the full dose of thiopental were to be successfully delivered into his circulation then he would still be deeply anesthetized, irrespective of his use of Topamax. However, it is also likely that his use of Topamax decreases the margin of safety and therefore makes him more vulnerable to the consequences of a partially failed thiopental administration. This, in combination with his higher-than-average weight of 267 lbs, and the relatively low dose of thiopental used by Ohio compared with other states, increases the risk that Mr. Cooey, in particular, would not be adequately anesthetized if he is executed under the current Ohio protocol.

### III - there is a foreseeable risk that establishing IV access in Mr. Cooey will be more problematic and challenging than in the normal/average prisoner.

Several lines of evidence raise heightened concerns that peripheral IV access in Mr. Cooey, compared with an average person, would be problematic.

A. Mr. Cooey's veins were assessed by a Registered Nurse named Mona Parks on 7/23/2003. This assessment occurred shortly before the scheduled, but since postponed, execution of Mr. Cooey, and appears to have been done specifically for the purpose of determining the suitability of Mr. Cooey's veins for IV access for execution. In the assessment Ms. Parks writes "Veins are sparce (sic) – has good vein to (sic) right hand – Smaller on on (sic) left"

B. Ms. Parks' note states that Mr. Cooey stated "When you start the IV's come 15 minutes early, I don't have any veins."

C. Mr. Cooey's attorney has informed me that Mr. Cooey informed her that "Mansfield Correctional medical staff encountered problems on two occasions when attempting to find a vein when they were drawing blood." It is important to understand that the removal of blood from a vein is, in almost all cases significantly easier than properly inserting an IV catheter within a vein. I note on Mr. Cooey's medical records that blood tests were performed, which shows that it was possible to withdraw blood. However, this does not provide assurance that it will be possible to insert IV catheters into Mr. Cooey's peripheral veins.

D. Additionally, it appears that Mr. Cooey suffers from morbid obesity, a condition that increases the risk that IV access, either peripheral or central, may be problematic. His height is 5'7" and his weight is 267 lbs. This corresponds to a Body Mass Index (BMI) of 41.8. Obesity is defined as a BMI of 30-40 and a

morbid obesity is defined as a BMI of greater than 40. Obese and morbidly obese people often have significant deposits of adipose tissue (fat) overlying their veins, making it difficult or impossible to successfully establish peripheral IV access. If Mr. Cooey has gained weight since the 2003 it is possible that the single "good" vein on his right hand identified by Ms. Parks may now be obscured.

Taken together, the above information strongly suggests that the establishment of reliable and safe peripheral venous access in Mr. Cooey may be very difficult or impossible. The need to achieve venous access via a cutdown or a central line is entirely foreseeable, and to my knowledge the ODRC does not have any meaningful articulated plan that takes this issue into account. By dint of its failure to plan, the ODRC is planning to fail, and at this time appears to intend to embark down the same path that led to the problematic execution of Mr. Clark. By contrast, other states and the U.S. Federal Government are aware of potential for problematic IV access and have taken steps to provide equipment and personnel for the placement of central lines and/or cutdown procedures.

## IV – Conclusion

Because of issues specific to Mr. Cooey, namely his use of the medication Topamax and the concerns surrounding intravenous access, the current ODRC procedures contain deficiencies and problems that present further and higher risk of an inhumane execution.

I declare under the laws of the United States and under penalty of perjury that the foregoing is true and correct.

DATED this 17th day of June, 2008

Mark J S. Heath. M.D



**Office of the Ohio Public Defender**
8 East Long Street
Columbus, Ohio 43215-2998



www.opd.ohio.gov

(614) 466-5394
Fax (614) 644-0708

TIMOTHY YOUNG
State Public Defender

June 19, 2008

Mr Charles Wille
Assistant Attorney General
30 East Broad Street - 23rd Floor
Columbus, Ohio 43215

Dear Mr. Wille,

I am contacting you as counsel for Governor Strickland, Director Collins, and Warden Kerns in two lethal injection lawsuits

The State of Ohio filed a motion to set an execution date for Richard Cooey (inmate no #194-016) in the Ohio Supreme Court  On Mr. Cooey's behalf, we opposed that motion  As you aware, we have lethal-injection litigation pending in federal court  However, if an execution date is set for Mr. Cooey, we want to bring two matters to your attention related to Mr Cooey's medical circumstances

We have two concerns regarding the use of Ohio's lethal injection protocol to execute Mr. Cooey based on his medical circumstances. The enclosed letter, prepared by Dr. Mark Heath, identifies our concerns in more detail.  (Dr. Heath reviewed Mr. Cooey's medical records prior to 2004  Mr. Cooey's counsel requested his current medical records from the Ohio Department of Rehabilitation and Correction  To date, those records have not been delivered to Mr Cooey's counsel )

First, Mr. Cooey has poor veins.  When he was last in the Death House at SOCF, records indicate that the IV team was advised that Mr. Cooey's veins were sparse  Thus, venous access is a concern.  In addition, Mr Cooey is morbidly obese, which also could impede the IV team's ability to obtain venous access.  There is no provision in Ohio's lethal injection protocol identifying what alternative means will be used to obtain venous access if the IV team is unable to obtain peripheral vein access  Given that Mr. Cooey's veins are "sparse", counsel for Mr. Cooey request that you, or you clients, identify what alternative means of obtaining venous access the IV team will use if it is unable to obtain peripheral vein access.

Second, Mr. Cooey is being treated with Topamax. a barbiturate, for cluster migraines  Use of Topamax can make Mr. Cooey resistant to thiopental  Dr. Heath has advised that given Mr. Cooey's treatment with Topamax, a 2 gram dose of sodium thiope⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚⬚t to

**EXHIBIT**

F

1

anesthetize him, especially considering Mr. Cooey's morbid obesity. Ohio's lethal injection protocol does not address, or consider, the potential of tolerance to the sodium thiopental. Given the absence of such from Ohio's protocol, counsel for Mr. Cooey requests that you, or your clients, identify what, if any, alterations you will make to Ohio's lethal injection protocol, including the dosage of drugs and ascertainment of depth of anesthesia, to ensure that Mr. Cooey will be adequately anesthetized during any execution.

Should additional examinations, assessments, or evaluations be undertaken by you, your clients, or their agents, regarding the issues raised in this letter, Mr. Cooey's counsel requests the opportunity to have our own expert present to observe such examination, assessment, or evaluation. I would note that there is precedent for allowing such presence. Dr. Heath advises that he was permitted to observe the assessment of Mr. Nelson in Alabama, when his comprised veins were brought to the State's attention.

While Mr. Cooey does not currently have a pending execution date, the pending motion to set an execution date requires prompt attention to these concerns. We trust a response will be forthcoming in a timely fashion. Thank you in advance for you attention to this matter.

Sincerely,

Kelly L. Culshaw Schneider
Supervisor, Death Penalty Division

Encl.

cc:     Tim Young, Esq.
        Greg Meyers, Esq
        Kim Rigby, Esq
        Joe Wilhelm, Esq

279901

2



**Nancy H. Rogers**
Attorney General
State of Ohio

Capital Crimes
30 E. Broad St., 23rd Floor
Columbus, OH 43215-3400
Telephone: (614) 728-7055
Facsimile: (614) 728-8600
www.ag.state.oh.us

June 20, 2008

Kelly L. Culshaw Schneider
Supervisor, Death Penalty Division
Ohio Public Defender's Office
8 East Long Street, 11th Floor
Columbus, Ohio 43215

RE: Richard Cooey

Dear Ms. Schneider;

  I am in receipt of your letter dated June 19, 2008. As you indicate in your letter, Ohio's procedure for execution of condemned prisoners is currently the subject of litigation between your client, Richard Cooey, and the Director of the Department of Rehabilitation and Corrections and other state officials. Consistent with my responsibilities as counsel for the defendants, I have forwarded your letter, including the attached affidavit of Dr. Mark Heath, to the Department of Rehabilitation and Corrections for review by my client.

     Sincerely

     Charles L. Wille
     Principal Assistant Attorney General

CLW:clk

cc: Gregory Trout

**EXHIBIT**
G

# LORAIN COUNTY COURT OF COMMON PLEAS
## LORAIN COUNTY, OHIO

FILED
ORAIN COUNTY

2008 JUN 10  A  9: 41

CLERK OF COMMON PLEAS
RON NABAKOWSKI

### RON NABAKOWSKI, Clerk
### JOURNAL ENTRY
### James M Burge, Judge

Date _____June 10, 2008_____

Case No  04CR065940
         05CR068067

STATE OF OHIO
Plaintiff

LORAIN COUNTY PROSECUTOR
Plaintiff's Attorney

VS

RUBEN O. RIVERA
RONALD MCCLOUD
Defendant

KREIG J BRUSNAHAN
DANIEL WIGHTMAN
Defendant's Attorney    (440) 930-2600

## JUDGMENT ENTRY

### The Case

These causes came on to be heard upon the motion filed by each defendant, challenging the Ohio lethal injection protocol as constituting cruel and unusual punishment, proscribed by the Eighth Amendment to the United States Constitution and by Section 9, Article 1 of the Ohio Constitution.

Defendants argue further that the Ohio lethal injection protocol violates the very statute which mandates that executions in Ohio be carried out by lethal injection, R.C 2949.22. Defendants claim that the three-drug protocol currently approved for use by the Ohio Department of Rehabilitation and Correction violates R.C 2949.22 because the drugs used create an unnecessary risk that the condemned will experience an agonizing and painful death. Defendants argue that the use of this protocol is contrary to the language of the statute, which mandates that the method of lethal injection cause death "quickly and painlessly." Defendants maintain that the use of this three-drug protocol arbitrarily abrogates the condemned person's statutorily created, substantive right to expect and to suffer a painless execution

The state of Ohio has responded that the current lethal injection protocol conforms to the statute because death is caused quickly, and unless an error is made in conducting the execution, which the state claims is extremely unlikely the drugs used will cause a painless death.

The court conducted hearings over two days and heard expert testimony from the defense (Mark Heath, M.D.) and from the state (Mark Dershwitz, M.D.). After reviewing the reports of the physicians, together with other written materials submitted with each

EXHIBIT

H

report, and after evaluating the testimony provided by each physician, the court makes the following findings of fact, draws the following conclusions of law, and enters its judgment accordingly.

## Findings of Fact

1.  The state of Ohio uses a three-drug lethal injection protocol consisting of sodium thiopental, pancuronium bromide and potassium chloride, administered in the above order, as follows:

    A.  sodium thiopental:  40 cc;
    B.  sodium thiopental:  40 cc;
    C.  saline flush: 20 cc;
    D.  pancuronium bromide: 25 cc;
    E.  pancuronium bromide: 25 cc;
    F.  saline flush: 20 cc;
    G.  potassium chloride: 50 cc;
    H.  saline flush: 20 cc.

2.  The properties of the above drugs produce the following results:

    A.  sodium thiopental – anesthetic;
    B.  pancuronium bromide – paralytic;
    C.  potassium chloride – cardiac arrest.

3.  The issue of whether an execution is painless arises, in part, from the use of pancuronium bromide, which will render the condemned person unable to breath, move, or communicate:

    "... it does not affect our ability to think, or to feel, or to hear, or anything, any of the senses, or any of our intellectual processes, or consciousness. So a person who's given pancuronium... would be wide awake, and - - but looking at them, you would - - they would look like they were peacefully asleep...But they would, after a time, experience intense desire to breathe. It would be like trying to hold one's breathe. And they wouldn't be able to draw a breath, and they would suffocate." (Heath, Tr. 72)

    "Pancuronium also would kill a person, but again, it would be excruciating. I wouldn't really call it painful, because I don't think being unable to breathe exactly causes pain. When we hold our breath it's clearly agonizing, but I wouldn't use the word "pain" to describe that. But clearly, an agonizing death would occur." (Heath, Tr. 75)

2

4    The second drug in the lethal injection protocol with properties which cause pain is potassium chloride. The reason is that before stopping the heart,

"it gets in contact with nerve fibers, it activates the nerve fibers to the maximal extent possible, and so it will activate pain fibers to the maximal extent that they can be activated. And so concentrated potassium causes excruciating pain in the veins as it travels up the arms and through the chest." (Heath, Tr. 73)

5.   Based upon the foregoing, and upon the agreement of the expert witnesses presented by each party, the court finds that pancuronium bromide and potassium chloride will cause an agonizing or an excruciatingly painful death, if the condemned person is not sufficiently anesthetized by the delivery of an adequate dosage of sodium thiopental.

6.   The following causes will compromise the delivery of an adequate dosage of sodium thiopental:

A. the useful life of the drug has expired;
B. the drug is not properly mixed in an aqueous solution;
C. the incorrect syringe is selected;
D. a retrograde injection may occur where the drug backs up into the tubing and deposits in the I.V. bag;
E. the tubing may leak;
F. the I.V. catheter may be improperly inserted into a vein, or into the soft issue;
G. the I.V. catheter, though properly inserted into a vein, may migrate out of the vein;
H. the vein injected may perforate, rupture, or otherwise leak.

7    The court fines further that:

A.    It is impossible to determine the condemned person's depth of anesthesia before administering the agonizing or painful drugs, in that medical equipment supply companies will not sell medical equipment to measure depth of anesthesia for the purpose of carrying out an execution;

B.    Physicians will not participate in the execution process, a fact which results in the use of paraprofessionals to mix the drugs, prepare the syringes, run the I.V. lines, insert the heparin lock (catheter) and inject the drugs; and,

C.     The warden of the institution is required to determine whether the condemned person is sufficiently anesthetized before the pancuronium bromide and the potassium chloride are delivered, and the warden is not able to fulfill his duty without specialized medical equipment

8.     The experts testifying for each party agreed, and the court finds that mistakes are made in the delivery of anesthesia, even in the clinical setting, resulting in approximately 30,000 patients per year regaining consciousness during surgery, a circumstance which, due to the use of paralytic drugs, is not perceptible until the procedure is completed.

9      The court finds further that the occurrence of the potential errors listed in finding no. 6, *supra,* in either a clinical setting or during an execution, is not quantifiable and, hence, is not predicable.

10     Circumstantial evidence exists that some condemned prisoners have suffered a painful death, due to a flawed lethal injection; however, the occurrence of suffering cannot be known, as post-execution debriefing of the condemned person is not possible.

## Conclusions of Fact

1.     Pancuronium bromide prevents contortion or grotesque movement by the condemned person during the delivery of the potassium chloride, which also prevents visual trauma to the execution witnesses should the level of anesthesia not be sufficient to mask the body's reaction to pain. Pancuronium is not necessary to cause death by lethal injection.

2.     Potassium chloride hastens death by stopping the heart almost immediately. Potassium chloride is not necessary to cause death by lethal injection.

3      The dosage of sodium thiopental used in Ohio executions (2 grams) is sufficient to cause death if properly administered, though death would not normally occur as quickly as when potassium chloride is used to stop the heart.

4.     If pancuronium bromide and potassium chloride are eliminated from the lethal injection protocol, a sufficient dosage of sodium thiopental will cause death rapidly and without the possibility causing pain to the condemned.

4

A.  Executions have been conducted where autopsy results showed that cardiac arrest and death have occurred after the administration of sodium thiopental, but before the delivery of pancuronium bromide and potassium chloride.

B.  In California, a massive dose (five grams) of sodium thiopental are used in the lethal injection protocol.

## Conclusions of Law

1.  Capital punishment is not per se cruel and unusual punishment, prohibited by the Eighth Amendment to the United States Constitution and by Section 1, Article 9 of the Ohio Constitution. Gregg v. Georgia (1976), 428 U.S. 153,187 (FN5.); State v. Jenkins (1984), 15 Ohio St. 3d 164, 167-169.

2.  Capital punishment administered by lethal injection is not per se cruel and unusual punishment, prohibited by the Eighth Amendment to the United States Constitution and by Section 1, Article 9 of the Ohio Constitution. Baze v. Rees (2008), 128 S. Ct. 1520, 1537-1538.

3.  The Ohio statute authorizing the administration of capital punishment by lethal injection, R.C.2949.22, provides, in relevant part, as follows:

    "(A) Except as provided in division (C) of this section, a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of *a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death*. The application of the drug or combination of drugs shall be continued until the person is dead. ." (emphasis supplied)

4.  The purpose of division (A), *supra,* is to provide the condemned person with an execution which is "quick" and "painless;" and the legislature's use of the word, "shall," when qualifying the state's duty to provide a quick and painless death signifies that the duty is mandatory.

5.  When the duty of the state to the individual is mandatory, a property interest is created in the benefit conferred upon the individual, i.e. "Property interests. are created and their dimensions are defined by existing *rules* or understandings that *stem from an independent source such as state law rules*...that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents of State Colleges v. Roth (1972), 408 U.S. 564, 577 (emphasis supplied).

6. If a duty from the state to a person is mandated by statute, then the person to whom the duty is owed has a substantive, property right to the performance of that duty by the state, which may not be "arbitrarily abrogated." Wolf v. McDonnell (1974), 418 U.S. 539, 557.

7. The court holds that the use of two drugs in the lethal injection protocol (pancuronium bromide and potassium chloride) creates an unnecessary and arbitrary risk that the condemned will experience an agonizing and painful death. Thus, the right of the accused to the expectation and suffering of a painless death, as mandated by R.C 2949.22(A), is "arbitrarily abrogated."

8. The court holds further that the words, "quickly and painlessly," must be defined according to the rules of grammar and common usage, and that these words must be read together, in order to accomplish the purpose of the General Assembly in enacting the statute, i.e. to enact a death penalty statute which provides for an execution which is painless to the condemned. R.C.1.42, 1.47.

9. The parties have agreed and the court holds that the word, "painless," is a superlative which cannot be qualified and which means "without pain."

10. The word, "quickly," is an adverb that always modifies a verb, in this case, the infinitive form of the verb, "to be." It describes the rate at which an action is done. Thus, the meaning of the word, "quickly," is relative to the activity described: to pay a bill "quickly" could mean, "by return mail;" to respond to an emergency "quickly," could mean, "immediately." Hence, the word "quickly" in common parlance means, "rapidly enough to complete an act, and no longer."

11. Therefore, the court holds that when the General Assembly, chose the word, "quickly," together with the word, "painlessly," in directing that death by lethal injection be carried out "quickly and painlessly," the legislative intent was that the word, "quickly," mean, "rapidly enough to complete a painless execution, but no longer."

12. This holding, supra, is consistent with the legislature intent that the death penalty in Ohio be imposed without pain to the condemned, the person for whose benefit the statute was enacted, but that the procedure not be prolonged, a circumstance that has been associated with protracted suffering.

13. Further, because statutes defining penalties must be construed strictly against the state and liberally in favor of the accused (condemned), the court holds that any interest the state may have, if it has such an interest,

6

in conducting an execution "quickly," i e. with a sense of immediacy, is outweighed by the substantive, property interest of the condemned person in suffering a painless death. R C 2901 04(A)

14.  Thus, because the Ohio lethal injection protocol includes two drugs (pancuronium bromide and potassium chloride) which are not necessary to cause death and which create an unnecessary risk of causing an agonizing or an excruciatingly painful death, the inclusion of these drugs in the lethal injection protocol is inconsistent with the intent of the General Assembly in enacting R.C 2949 22, and violates the duty of the Department of Rehabilitation and Correction, mandated by R.C.2949 22, to ensure the statutory right of the condemned person to an execution without pain, *and to an expectancy that his execution will be painless.*

15.  As distinguished from this case, the Kentucky lethal injection statute has no mandate that an execution be painless, Ky Rev. Stat Am. §431 220(1) (a). Thus, the analysis of that statute, having been conducted under the Eighth Amendment "cruel and unusual" standard, is not applicable here because "...the [U.S ] Constitution does not demand the avoidance of all risk of pain in carrying out executions." Baze, supra, 128 S. Ct at 1529. In contrast, the court holds that R.C.2949 22 demands the avoidance of any unnecessary risk of pain, and, as well, any unnecessary expectation by the condemned person that his execution may be agonizing, or excruciatingly painful.

16.  The purpose of R C 2949 22 is to insure that the condemned person suffer only the loss of his life, and no more.

17.  The mandatory duty to insure a painless execution is not satisfied by the use of a lethal injection protocol which is painless, assuming no human or mechanical failures in conducting the execution.

18.  The use of pancuronium bromide and potassium chloride is ostensibly permitted because R.C 2949.22 permits "a lethal injection of a drug or combination of drugs "

19.  However, as set forth *supra,* the facts established by the evidence, together with the opinions expressed by the experts called to testify by each party, compel the conclusion of fact that a single massive dose of sodium thiopental or another barbiturate or narcotic drug will cause certain death, reasonably quickly, and with no risk of abrogating the substantive right of the condemned person to expect and be afforded the painless death, mandated by R.C 2949 22.

## Analysis

1    The court begins its analysis of R.C 2949.22 with the presumption of its compliance with the United States and Ohio Constitutions, and that the entire statute is intended to be effective. R.C.1.47(A),(B). However, the court holds that the phrase, "or combination of drugs," ostensibly permits the use of substances which, *de facto*, create an unnecessary risk of causing an agonizing or an excruciatingly painful death

2.   This language offends the purpose of the legislature in enacting R.C.4929.22, and thus, deprives the condemned person of the substantive right to expect and to suffer an execution without the risk of suffering an agonizing or excruciatingly painful death.

3.   The court holds, therefore, that the legislature's use of the phrase, "or combination of drugs," has proximately resulted in the arbitrary abrogation of a statutory and substantive right of the condemned person, in a violation of the Fifth and Fourteenth Amendments to the United Constitution and Section 16, Article 1 of the Ohio Constitution (due process clause).

## Remedy

1.   R.C.1.50, however, allows the court to sever from a statute that language which the court finds to be constitutionally offensive, if the statute can be given effect without the offending language. Geiger v. Geiger (1927), 117 Ohio St. 451, 466.

2.   The court finds that R.C.2949.22 can be given effect without the constitutionally offense language, and further, that severance is appropriate. State v. Foster (206), 109 Ohio St. 3d. 1, 37-41.

3.   Thus, the court holds that the words, "or a combination of drugs," may be severed from R.C.2949.22; that the severance will result in a one-drug lethal injection protocol under R.C.2949.22; that a one-drug lethal injection protocol will require the use of an anesthetic drug, only; and, that the use of a one-drug protocol will cause death to the condemned person "rapidly," i.e. in an amount of time sufficient to cause death, without the unnecessary risk of causing an agonizing or excruciatingly painful death, or of causing the condemned person the anxiety of anticipating a painful death.

8

## Holding

4.  Therefore, the holds that severance of the words, "or combination of drugs," from R C 2949 22 is necessary to carry out the intent of the legislature and thus, to cure the constitutional infirmity

## ORDER

Accordingly, it is ordered that the words, 'or combination of drugs," be severed from R C 2949.22; that the Ohio Department of Rehabilitation and Correction eliminate the use of pancuronium bromide and potassium chloride from the lethal injection protocol; and, if defendants herein are convicted and sentenced to death by lethal injection, that the protocol employ the use of a lethal injection of a single, anesthetic drug.

It is so ordered.

Honorable Judge James M Burge